AL:MKP
F. #2017R00050

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA

  - against -

RICHARD LUTHMANN,
GEORGE PADULA III and
MICHAEL BECK,

      Defendants.

- - - - - - - - - - - - X

**CR 17-**    **664**

MAUSKOPF, J.

I N D I C T M E N T   REYES, M.J.

Cr. No. _____
(T. 18, U.S.C., §§ 894(a), 924(c)(1)(A)(i),
 924(c)(1)(A)(ii), 924(d)(1), 981(a)(1)(C),
 982(a)(1), 982(a)(2)(B), 982(b)(1),
 1028A(a)(1), 1028A(b), 1028A(c)(4),
 1028A(c)(5), 1029(a)(5), 1029(c)(1)(A)(ii),
 1029(c)(1)(C), 1029(c)(2), 1201(a)(1),
 1201(c), 1349, 1956(h), 1957(a), 1957(b),
 1957(d)(1), 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
 § 2461(c))

THE GRAND JURY CHARGES:

  At all times relevant to this Indictment, unless otherwise indicated:

I.  Background

  1.  The defendant RICHARD LUTHMANN was an attorney licensed in

New York and New Jersey.   LUTHMANN practiced at The Luthmann Law Firm PLLC (the

"Firm"), which had its main office at 1811 Victory Boulevard, Staten Island, New York (the

"Law Office").

  2.  For several years, LUTHMANN represented Co-Conspirator 1, an

individual whose identity is known to the Grand Jury, in connection with lawsuits brought

against Co-Conspirator 1 related to businesses that Co-Conspirator 1 operated selling scrap

metal to overseas companies.   Scrap metal is generally sold overseas in shipping containers.

Co-Conspirator 1's customers would pay based on the value of the type of scrap metal and the expected weight of the filled containers.

3.      In or around 2014, LUTHMANN introduced Co-Conspirator 1 to the defendant GEORGE PADULA III.   LUTHMANN told Co-Conspirator 1 that PADULA III's family was in the garbage transfer business and asked Co-Conspirator 1 to teach PADULA III about the scrap metal business.   Co-Conspirator 1 agreed. LUTHMANN also said that he had previously performed legal work for PADULA III, PADULA III's father and PADULA III's uncle.

4.      Thereafter, LUTHMANN, PADULA III and Co-Conspirator 1 began to meet regularly at the Law Office and at a restaurant located a few blocks from the Law Office.

5.      PADULA III and LUTHMANN told Co-Conspirator 1 that PADULA III's father was a member of a New York-based organized crime family and that PADULA III's uncle was a high-ranking member of the same.

II.    Scrap Metal Fraud

    A.    Background

6.      In or around Summer 2015, LUTHMANN, PADULA III and Co-Conspirator 1 (together, the "Initial Co-Conspirators") agreed to defraud companies seeking to purchase scrap metal.   Co-Conspirator 1 identified potential victims primarily through postings the potential victims placed in a trade publication.   LUTHMANN told Co-Conspirator 1 that PADULA III would be helpful because if there were any disgruntled

victims, they could rely on PADULA III's organized crime connections to settle any disputes.

7.      On or about August 21, 2015, LUTHMANN registered two fraudulent companies with the New York Department of State that the Initial Co-Conspirators used to commit fraud: Commercial Metals NY Corp. ("Commercial") and Omni Metal Corporation ("Omni").   The addresses of record for both Commercial and Omni, when they were registered, were the same as the address of the Law Office.

B.      Commercial

8.      At first, using the Commercial name, the Initial Co-Conspirators agreed to defraud victims by obtaining deposits from victims and then not providing them with any scrap metal at all (the "Commercial transactions").   Co-Conspirator 1 contacted victims of the Commercial transactions and used his real name to facilitate the fraud.   Bank accounts controlled by LUTHMANN and Co-Conspirator 1 were used to facilitate the Commercial transactions.

9.      On or about October 2, 2015, one of the Commercial transactions' victims ("Doe Company 1"), a business the identity of which is known to the Grand Jury, wired $31,500 from South El Monte, California to an Interest on Lawyer Account Fund ("IOLA") account belonging to LUTHMANN, maintained at Santander Bank, located on Staten Island, New York (the "IOLA Account").   The wire notation on the IOLA Account listed "Commercial Metals" as the beneficiary.   The "Originator to Beneficiary" information stated "652 Sharrotts Road, Staten Island NY 10301," which was an address the Initial Co-

Conspirators provided to victims so they would see an industrial area with a warehouse when they entered the address into an Internet search engine.

10.     On or about October 6, 2015, LUTHMANN wired $30,000 from the IOLA Account to a bank account controlled by Co-Conspirator 1 ("Co-Conspirator 1's Account") maintained at TD Bank, located in Rumson, New Jersey.

11.     Doe Company 1 subsequently threatened to press criminal charges against Co-Conspirator 1.   LUTHMANN told Co-Conspirator 1 that they should refund money to Doe Company 1 to avoid Co-Conspirator 1 being charged criminally.   After this incident, Co-Conspirator 1 expressed concern to LUTHMANN about being the person who was risking criminal liability.

C.     Omni

i.     Overview

12.     After Co-Conspirator 1 expressed concern about facing criminal liability for the Commercial transactions, the Initial Co-Conspirators agreed to defraud victims differently using the Omni name (the "Omni transactions").   The Omni transactions involved contracting with victims to ship containers of valuable scrap metal, but then padding the weight of the containers with cheap filler material.   The Initial Co-Conspirators would put in only enough valuable scrap metal to dupe victims, which they did by placing the valuable scrap metal on top of the container to conceal the filler material and behind predrilled holes in the container to make it look as if the entire container were filled with valuable scrap metal.

13.   Co-Conspirator 1 had a contact from whom the Initial Co-Conspirators obtained scrap metal for the Omni transactions.   The Initial Co-Conspirators needed a warehouse where they could store the scrap metal and filler material, and load shipping containers.   The Initial Co-Conspirators agreed to rent warehouse space on Staten Island, New York (the "Warehouse") from Co-Conspirator 2, an individual whose identity is known to the Grand Jury.   Co-Conspirator 2 charged the Initial Co-Conspirators an above-market rate for use of the Warehouse, knowing that the containers were being padded with filler material.   The containers for the Omni transactions were frequently filled in the presence of Co-Conspirator 2 and Co-Conspirator 2's employees.   Co-Conspirator 2 also made suggestions for filler materials and helped procure filler materials for the Omni transactions.

14.   LUTHMANN told PADULA III and Co-Conspirator 1 that the Omni transactions would be difficult to prosecute criminally because it would be difficult to prove that the filler material had been added to the containers before they left the Warehouse, as opposed to later in the shipping process.

15.   Because of Co-Conspirator 1's concerns about criminal exposure, LUTHMANN suggested that the Initial Co-Conspirators commit the Omni transactions in the name of one of LUTHMANN's clients who was blind and living on public assistance (the "Client").   LUTHMANN suggested the Initial Co-Conspirators use the Client to set up bank accounts into which they would have victims wire money.

16.   LUTHMANN told PADULA III and Co-Conspirator 1 to use aliases when interacting with the Client and with victims of the Omni transactions, which PADULA III and Co-Conspirator 1 did.

17.    LUTHMANN proposed to the Client that the Client be listed as the President of Omni, and told the Client he would be paid for his participation. The Client expressed concern that he could face criminal exposure or lose his public assistance if the government discovered his involvement with Omni, but LUTHMANN assured the Client that the government would not find out.

18.    Once the Client agreed to participate, the Initial Co-Conspirators agreed to have the Client open bank accounts in order to facilitate the fraud. Some banks turned the Client down, but eventually several banks, including Northfield Bank, Israel Discount Bank ("IDB") and TD Bank did open accounts (the "Northfield Account," the "TD Account" and the "IDB Account," respectively; collectively, the "Fraudulent Accounts") for the Client based on false information provided to them. The Fraudulent Accounts were each located on Staten Island, New York.

19.    Emails containing various misrepresentations, including false invoices, were sent to victims as part of the Omni transactions. Some of the emails appeared to have been sent by or copied to the Client, without the Client's knowledge.

20.    LUTHMANN also introduced PADULA III and Co-Conspirator 1 to Co-Conspirator 3, an individual whose identity is known to the Grand Jury. Co-Conspirator 3 performed various roles in the Omni transactions in exchange for payment of several hundred dollars per task. Co-Conspirator 3 met with victims, supervised and participated in the filling of shipping containers and often accompanied the Client to complete financial transactions involving the Fraudulent Accounts.

21.     From in or around November 2015 to February 2016, victims wired money for the Omni transactions to the Fraudulent Bank Accounts.   The Initial Co-Conspirators received the proceeds of Omni transactions through transfers from the Fraudulent Accounts to other accounts controlled by LUTHMANN and Co-Conspirator 1 and through cash withdrawals.   When the proceeds were withdrawn in cash, Co-Conspirator 3 would accompany the Client to the banks and retrieve the cash.   The Initial Co-Conspirators usually divided the proceeds at the Law Office.

ii.     <u>Northfield Bank and Related Transactions</u>

22.     On or about October 26, 2015, Northfield Bank opened the Northfield Account in the name of Omni, with the Client listed as the signatory and owner of Omni. The bylaws for Omni, which LUTHMANN prepared and which were submitted to Northfield Bank in order to open the Northfield Account, listed the Client as having 100% ownership of Omni.

23.     Doe Company 2, a business the identity of which is known to the Grand Jury, contracted to purchase electric motors from Omni.   Doe Company 2 subsequently made three wire transfers to the Northfield Account on Staten Island, New York from Arcadia, California: (1) a transfer of $11,862.15 made on or about November 4, 2015, (2) a transfer of $23,556.89 made on or about November 6, 2015, and (3) a transfer of $12,401.42 made on or about November 6, 2015.   The containers shipped to Doe Company 2 were filled primarily with concrete blocks and contained just enough electric motors to conceal the filler material.

24.     On or about November 6, 2016, a $22,500 check was written to "Luthmann Law Firm IOLA" against the Northfield Account.   The check was signed by the Client.   The check was endorsed by LUTHMANN and deposited the same day into the IOLA Account.   Also on the same day, LUTHMANN transferred $10,000 from the IOLA Account into a checking account in LUTHMANN's name also maintained at Santander Bank (the "Luthmann Checking Account").   On or about November 9, 2015, three days later, LUTHMANN transferred $12,500 from the IOLA Account into the Luthmann Checking Account.

25.     The Northfield Account was closed on or about November 9, 2015, and the $18,292.63 balance was withdrawn in cash.

iii.     IDB and Related Transactions

26.     LUTHMANN told PADULA III and Co-Conspirator 1 that it was better to use a small bank for the Omni transactions because, according to LUTHMANN, smaller banks have fewer compliance procedures in place.

27.     On or about November 10, 2015, based on a referral from LUTHMANN, IDB opened the IDB Account, with the Client listed as the signatory. LUTHMANN had been an IDB customer for several years.   IDB had only eight locations in the United States and accepted clients almost exclusively through referrals.

28.     The bylaws for Omni, which LUTHMANN prepared and which were submitted to IDB in order to open the IDB Account, listed the Client as having 100 percent ownership of Omni.   Additionally, the IDB Account opening documents listed the Client as

the 100 percent beneficial owner for Omni.   The IDB opening documents also stated that there was no cash activity expected as part of the business.

29.     All documentation regarding the IDB Account was mailed to the Law Office, including the debit card associated with the IDB Account (the "Debit Card"), which bore the name of Omni and the name of the Client.

30.     As detailed below, from on or about November 13, 2015 to on or about December 1, 2015, victims of the Omni transactions wired $433,587 to the IDB Account.

31.     Doe Company 3, a business the identity of which is known to the Grand Jury, contracted with Omni to purchase electric motors.   Doe Company 3 subsequently made two wire transfers, on or about November 13, 2015, to the IDB Account on Staten Island, New York from Jersey City, New Jersey: (1) a transfer of $11,084.96, and (2) a transfer of $11,285.43.   The containers shipped to Doe Company 3 were filled primarily with concrete blocks and contained just enough electric motors to conceal the filler material.

32.     Doe Company 4, a business the identity of which is known to the Grand Jury, contracted with Omni to purchase electric motors and insulated copper wire. Doe Company 4 subsequently made two wire transfers to the IDB Account on Staten Island, New York from Pittsburgh, Pennsylvania: (1) a transfer of $156,015.95 made on or about November 19, 2015, and (2) a transfer of $24,219.12 made on or about November 25, 2015. The containers shipped to Doe Company 4 were filled primarily with concrete blocks and other filler material and contained just enough electric motors and insulated copper wire to conceal the filler material.

33.     Doe Company 5, a business the identity of which is known to the

Grand Jury, contracted with Omni to purchase insulated copper wire.   Doe Company 5

subsequently made two wire transfers to the IDB Account on Staten Island, New York from

New Brunswick, New Jersey: (1) a transfer of $50,176.37 made on or about November 25,

2015, and (2) a transfer of $116,793.26 made on or about December 1, 2015.   The

containers shipped to Doe Company 5 were filled primarily with plastic bags filled with

concrete and contained just enough insulated copper wire to conceal the filler material.

34.     As detailed below, from on or about November 13, 2015 to on or about

December 7, 2015, nearly all of the $433,587 that victims wired into the IDB Account was

withdrawn in cash by the Client and Co-Conspirator 3, wired to the IOLA Account or wired

to the Co-Conspirator 1 Account.

35.     The following cash withdrawals were made from the IDB Account:

(1) $14,500 on or about November 16, 2015, (2) $900 on or about November 19, 2015,

(3) $31,000 on or about November 24, 2015, (4) $76,000 on or about November 27, 2015,

(5) $1,100 on or about November 30, 2015, (6) $9,400 on or about December 3, 2015, and

(7) $25,000 on or about December 4, 2015.   Co-Conspirator 3 accompanied the Client to

IDB to make those cash withdrawals.

36.     The following wire transfers were made from the IDB Account to the

IOLA Account: (1) $153,000 on or about November 23, 2015, (2) $20,000 on or about

November 24, 2015, and (3) $25,000 on or about December 4, 2015.

37.     On or about November 23, 2015, the same day as the $153,000 wire

from the IDB Account to the IOLA Account, LUTHMANN made three wire transfers from

the IOLA Account: (1) $31,500 to Doe Company 1, (2) $92,940.96 to the Co-Conspirator 1 Account, and (3) $38,559.04 to the Co-Conspirator 1 Account.

38.    The following wire transfer was made from the IDB Account to the Co-Conspirator 1 Account: $40,000 on or about December 4, 2015.

39.    To initiate some of the wire transfers from the IDB Account, Co-Conspirator 1, using an alias, sent emails to IDB and included in the "cc" line an email address that bore the Client's name and appeared to belong to the Client, making it appear as if the Client had been copied on the emails.   In fact, the Client did not set up that email account and was unaware of the emails sent to and from that account.   On at least one occasion, LUTHMANN was also copied on one of these emails.

40.    In or around early December 2015, while Co-Conspirator 1 was in the hospital recovering from heart surgery, LUTHMANN made the following charges to the Firm using the Debit Card: (1) $2,500 on or about December 2, 2015, (2) $2,500 on or about December 3, 2015, (3) another $2,500 on or about December 3, 2015, (3) $2,500 on or about December 7, 2015, (4) $4,000 on or about December 7, 2015 and (5) another $4,000 on or about December 7, 2015.   Neither the Client nor Co-Conspirator 1 was aware that LUTHMANN was using the Debit Card.   These transactions were processed using a credit card processor at the Law Office.

41.    On or about December 10, 2016, the IDB Account was overdrawn.   IDB closed the IDB Account on or about February 12, 2016.

iv.   TD Bank

42.    On or about January 29, 2016 the TD Account was opened in the name of Omni and the Client.   On or about February 3, 2016, one victim of the Omni transactions wired money into the TD Account.   The account was closed on March 3, 2016.

III.   Luring, Gunpoint Extortion and Confinement of Co-Conspirator 1

43.    Both during and after the scrap metal fraud, LUTHMANN demanded legal fees from Co-Conspirator 1 that LUTHMANN claimed he was owed for various cases in which he represented Co-Conspirator 1.   Co-Conspirator 1 was never provided with billing records or an accounting of outstanding fees, but he sporadically paid LUTHMANN when LUTHMANN demanded money.

44.    In or around January 2016, while Co-Conspirator 1 was recovering from heart surgery, PADULA III visited him and informed him that LUTHMANN wanted Co-Conspirator 1 to pay LUTHMANN the legal fees that Co-Conspirator 1 purportedly owed him.   Co-Conspirator 1 gave PADULA III cash to pay LUTHMANN, but was short by approximately $7,000.   PADULA III agreed to loan Co-Conspirator 1 the $7,000.

45.    In or about the summer of 2016, Co-Conspirator 1 began a new scheme to defraud using a company that Co-Conspirator 1 and another individual operated. Co-Conspirator 1 did not include PADULA III in the scheme in part because he did not want to share the proceeds with him.

46.    In or around August 2016, LUTHMANN told Co-Conspirator 1 that "Chinese men" had shown up at the Law Office, one with a gun, looking for Omni, because the address for the Law Office was listed on all of the Omni documents.   LUTHMANN said

that he had had a private investigator research these men and learned they were members of

Chinese organized crime. LUTHMANN and PADULA III told Co-Conspirator 1 that they

had the defendant MICHAEL BECK, whom LUTHMANN and PADULA III described as an

enforcer for the organized crime family of which PADULA III's father and uncle were

members and "muscle" for PADULA III, conduct a "sit down" with the Chinese men in an

attempt to resolve the matter. At the direction of LUTHMANN and PADULA III,

Co-Conspirator 1 paid a total of $23,000 to PADULA III to provide to BECK and was told

by LUTHMANN and PADULA III that they would also each pay $20,000 to BECK.

LUTHMANN and PADULA III told Co-Conspirator 1 that BECK and PADULA III's uncle

had a "sit down" with the Chinese men and resolved the conflict.

47.     On or about December 5, 2016, LUTHMANN arranged for

Co-Conspirator 1 to come to the Law Office under the guise of having Co-Conspirator 1 sign

some legal paperwork and to meet before going out together for the evening. When

Co-Conspirator 1 arrived at the Law Office, LUTHMANN was not there. Co-Conspirator 1

contacted LUTHMANN, who told him to wait inside a conference room in the Law Office

(the "Room"), which had only one door.

48.     While Co-Conspirator 1 was waiting in the Room, PADULA III and

BECK entered it. Co-Conspirator 1 tried to run to the door in order to leave the Room, but

BECK blocked him, pushed him and told him to sit down. BECK pulled out a gun and

aimed it at Co-Conspirator 1's head and knee. With the gun still out, BECK told

Co-Conspirator 1 that Co-Conspirator 1 owed BECK $10,000 because PADULA III had

loaned Co-Conspirator 1 $7,000 and BECK had then purchased that debt and added a $3,000

"vig," or interest payment.   BECK then handed the gun to PADULA III and left the room,

instructing PADULA III to shoot Co-Conspirator 1 in the knee.   After BECK left, PADULA

III took the bullets out of the gun in front of Co-Conspirator 1, and told him BECK was

serious.   PADULA III walked Co-Conspirator 1 out of the Law Office and told Co-

Conspirator 1 not to call the police.

COUNT ONE
(Wire Fraud)

49.     The allegations contained in paragraphs one through 42 are realleged

and incorporated as if fully set forth in this paragraph.

50.     In or about and between August 2015 and February 2016, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants RICHARD LUTHMANN and GEORGE PADULA III, together with others, did

knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more

businesses, including Doe Company 1, Doe Company 2, Doe Company 3, Doe Company 4

and Doe Company 5, and to obtain money and property from them by means of materially

false and fraudulent pretenses, representations and promises, and for the purpose of

executing such scheme and artifice, to transmit and cause to be transmitted by means of wire

communication in interstate and foreign commerce writings, signs, signals, pictures and

sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT TWO
### (Aggravated Identity Theft)

51.     The allegations contained in paragraphs one through 42 are realleged
and incorporated as if fully set forth in this paragraph.

52.     In or about and between August 2015 and February 2016, both dates
being approximate and inclusive, within the Eastern District of New York and elsewhere, the
defendants RICHARD LUTHMANN and GEORGE PADULA III, together with others,
during and in relation to the crime charged in Count One, did knowingly and intentionally
possess and use, without lawful authority, one or more means of identification, to wit: the
name and purported email address, of another person, to wit: the Client, knowing that means
of identification belonged to another person.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028A(c)(5),
2 and 3551 et seq.)

## COUNT THREE
### (Money Laundering Conspiracy)

53.     The allegations contained in paragraphs one through 42 are realleged
and incorporated as if fully set forth in this paragraph.

54.     In or about and between August 2015 and February 2016, both dates
being approximate and inclusive, within the Eastern District of New York and elsewhere, the
defendants RICHARD LUTHMANN and GEORGE PADULA III, together with others, did
knowingly and intentionally conspire to engage in one or more monetary transactions, to wit:
deposits, withdrawals and transfers of funds and monetary instruments, in and affecting
interstate and foreign commerce, by, through and to one or more financial institutions, in

criminally derived property that was of a value greater than $10,000 and that was derived

from specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States

Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h), 1957(b), 1957(d)(1) and

3551 et seq.)

## COUNT FOUR
(Money Laundering)

55.     The allegations contained in paragraphs one through 42 are realleged

and incorporated as if fully set forth in this paragraph.

56.     In or about and between November 2015 and December 2015, both

dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendants RICHARD LUTHMANN and GEORGE PADULA III, together

with others, did knowingly and intentionally engage in one or more monetary transactions, to

wit: deposits, withdrawals and transfers of funds and monetary instruments, by, through and

to one or more financial institutions, in and affecting interstate and foreign commerce, in

criminally derived property that was of a value greater than $10,000 and that was derived

from specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States

Code, Section 1343.

(Title 18, United States Code, Sections 1957(a), 1957(b), 1957(d)(1) and

3551 et seq.)

## COUNT FIVE
### (Access Device Fraud)

57.     The allegations contained in paragraphs one through 42 are realleged and incorporated as if fully set forth in this paragraph.

58.     In or about December 2015, within the Eastern District of New York and elsewhere, the defendant RICHARD LUTHMANN, together with others, did knowingly and with intent to defraud, effect transactions, with an access device, to wit: a debit card, issued to another person, to wit: the Client, to receive payments and other things of value during a one-year period, the aggregate value of which was greater than $1,000, in a manner affecting interstate commerce.

(Title 18, United States Code, Sections 1029(a)(5), 1029(c)(1)(A)(ii), 2 and 3551 et seq.)

## COUNT SIX
### (Aggravated Identity Theft)

59.     The allegations contained in paragraphs one through 42 are realleged and incorporated as if fully set forth in this paragraph.

60.     In or about December 2015, within the Eastern District of New York and elsewhere, the defendant RICHARD LUTHMANN, together with others, during and in relation to the crimes charged in Counts One and Five, did knowingly and intentionally possess and use, without lawful authority, one or more means of identification, to wit: the

name and debit account number of another person, to wit: the Client, knowing that means of

identification belonged to another person.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028A(c)(4),

1028A(c)(5), 2 and 3551 et seq.)

## COUNT SEVEN
### (Kidnaping Conspiracy)

61.     The allegations contained in paragraphs 43 through 48 are realleged

and incorporated as if fully set forth in this paragraph.

62.     On or about December 5, 2016, within the Eastern District of New

York and elsewhere, the defendants RICHARD LUTHMANN, GEORGE PADULA III and

MICHAEL BECK, together with others, did knowingly and intentionally conspire to seize,

confine, inveigle, kidnap, abduct and carry away and hold, for ransom and reward and

otherwise, a person, to wit: Co-Conspirator 1, and to use one or more means, facilities and

instrumentalities of interstate and foreign commerce, to wit: cellular telephones, in

committing and in furtherance of the commission of the offense, contrary to Title 18, United

States Code, Section 1201(a)(1).

63.     In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York and elsewhere, the defendants, together with others, did

commit and cause to be committed, among others, the following:

### Overt Acts

(a)     On or about December 5, 2016, LUTHMANN lured

Co-Conspirator 1 to the Law Office under the false pretenses of having Co-Conspirator 1

meet him to sign paperwork and to go out together for the evening; and

(b)     PADULA III and BECK demanded money from Co-Conspirator 1 at gunpoint in the Room, preventing Co-Conspirator 1 from leaving the Room.

(Title 18, United States Code, Sections 1201(c) and 3551 et seq.)

## COUNT EIGHT
### (Kidnaping)

64.     The allegations contained in paragraphs 43 through 48 are realleged and incorporated as if fully set forth in this paragraph.

65.     On or about December 5, 2016, within the Eastern District of New York and elsewhere, the defendants RICHARD LUTHMANN, GEORGE PADULA III and MICHAEL BECK, together with others, did knowingly and intentionally seize, confine, inveigle, kidnap, abduct and carry away and hold, for ransom and reward and otherwise, one or more persons, to wit: Co-Conspirator 1, and use one or more means, facilities and instrumentalities of interstate and foreign commerce, to wit: cellular telephones, in committing and in furtherance of the commission of the offense.

(Title 18, United States Code, Sections 1201(a)(1), 2 and 3551 et seq.)

## COUNT NINE
### (Extortionate Collection of Credit Conspiracy)

66.     The allegations contained in paragraphs 43 through 48 are realleged and incorporated as if fully set forth in this paragraph.

67.     In or about and between January 2016 and December 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RICHARD LUTHMANN, GEORGE PADULA III and MICHAEL BECK,

together with others, did knowingly and intentionally conspire to participate in the use of

extortionate means to collect and attempt to collect one or more extensions of

credit from Co-Conspirator 1, and to punish such person for the nonrepayment thereof.

(Title 18, United States Code, Sections 894(a) and 3551 et seq.)

## COUNT TEN
(Extortionate Collection of Credit)

68.     The allegations contained in paragraphs 43 through 48 are realleged

and incorporated as if fully set forth in this paragraph.

69.     In or about and between January 2016 and December 2016, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants RICHARD LUTHMANN, GEORGE PADULA III and MICHAEL BECK,

together with others, did knowingly and intentionally participate in the use of extortionate

means to collect and attempt to collect one or more extensions of credit from

Co-Conspirator 1, and to punish such person for the nonrepayment thereof.

(Title 18, United States Code, Sections 894(a), 2 and 3551 et seq.)

## COUNT ELEVEN
(Using, Carrying and Possessing a Firearm)

70.     The allegations contained in paragraphs 43 through 48 are realleged

and incorporated as if fully set forth in this paragraph.

71.     On or about December 5, 2016, within the Eastern District of New

York and elsewhere, the defendants RICHARD LUTHMANN, GEORGE PADULA III and

MICHAEL BECK, together with others, did knowingly and intentionally use and carry one

or more firearms during and in relation to one or more crimes of violence, to wit: the crimes

charged in Counts Seven through Ten, and did knowingly and intentionally possess said firearms in furtherance of such crimes of violence, one or more of which firearms were brandished.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 2 and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS ONE AND SEVEN THROUGH TEN

72.     The United States hereby gives notice to the defendants charged in Counts One and Seven through Ten, that, upon their conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

73.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third party;

(c)   has been placed beyond the jurisdiction of the court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS THREE AND FOUR

74.     The United States hereby gives notice to the defendants charged in Counts Three and Four that, upon their conviction of either such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property.

75.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third party;

(c)   has been placed beyond the jurisdiction of the court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

other property of the defendants up to the value of the forfeitable property described in this

forfeiture allegation.

      (Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21,

United States Code, Section 853(p))

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT FIVE

      76.    The United States hereby gives notice to the defendant charged in

Count Five that, upon his conviction of such offense, the government will seek forfeiture in

accordance with: (a) Title 18, United States Code, Section 982(a)(2)(B), which requires any

person convicted of such offense to forfeit any property constituting, or derived from,

proceeds obtained directly or indirectly as a result of such offense; and (b) Title 18, United

States Code, Section 1029(c)(1)(C), which requires any person convicted of such offense to

forfeit any personal property used or intended to be used to commit the offense.

      77.    If any of the above-described forfeitable property, as a result of any act

or omission of such defendant:

          (a)   cannot be located upon the exercise of due diligence;

          (b)   has been transferred or sold to, or deposited with, a third party;

          (c)   has been placed beyond the jurisdiction of the court;

          (d)   has been substantially diminished in value; or

          (e)   has been commingled with other property which cannot be divided

without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Sections 982(b)(1) and 1029(c)(2), to seek forfeiture of any other property of such defendant up to the value of the forfeitable property described in this forfeiture allegation.

      (Title 18, United States Code, Sections 982(a)(2)(B), 982(b)(1), 1029(c)(1)(C) and 1029(c)(2); Title 21, United States Code, Section 853(p))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT ELEVEN

     78.    The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Eleven, the government will seek forfeiture in accordance with Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c), which require the forfeiture of any firearm or ammunition involved in or used in any knowing violations of Title 18, United States Code, Section 922 or Section 924.

     79.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

          (a)   cannot be located upon the exercise of due diligence;

          (b)   has been transferred or sold to, or deposited with, a third party;

          (c)   has been placed beyond the jurisdiction of the court;

          (d)   has been substantially diminished in value; or

          (e)   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 924(d)(1); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2014R01668
JUN. 85

No.

# UNITED STATES DISTRICT COURT

### EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*RICHARD LUTHMANN, et al.*

Defendants.

# INDICTMENT

(T. 18, U.S.C., §§ 894(a), 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(d)(1), 981(a)(1)(C), 982(a)(1), 982(a)(2)(B), 982(b)(1), 1028A(a)(1), 1028A(b), 1028A(c)(4), 1028A(c)(5), 1029(a)(5), 1029(c)(1)(A)(ii), 1029(c)(1)(C), 1029(c)(2), 1201(a)(1), 1201(c), 1349, 1956(h), 1957(a), 1957(b), 1957(d)(1), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

A true bill.

_____
Foreperson

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
Clerk

*Bail, $* _____

_____

**Moira Kim Penza, Assistant U.S. Attorney (718) 254-6454**