

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KDE:JPM/GN
F. #2017R00050

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2021

<u>By ECF and E-mail</u>

The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. George Padula, III
             <u>Criminal Docket No. 17-664 (S-1) (RJD)</u>

Dear Judge Dearie:

      The government respectfully submits this letter in advance of the defendant George Padula's sentencing proceeding, which is scheduled to occur before the Court on April 28, 2021 at 10:30 a.m.  The defendant, a self-styled gangster, conspired with others to commit two large-scale scrap metal fraud schemes that has cost its victims upward of $550,000.  After the fraudulent scheme was complete, the defendant arranged with two co-conspirators to briefly kidnap and hold at gunpoint one of their criminal associates, demanding repayment of a debt owed to the defendant.  Even after charges were filed in this case, defendant has demonstrated a continued lack of remorse for the offense conduct, punctuated by frequent, troubling outbursts that shift responsibility for the defendant's behavior to the government, law enforcement, and even people who had nothing to do with this prosecution.  In view of the serious nature of the offenses, and the particular need for specific deterrence and just punishment, a sentence of 87 months' imprisonment is appropriate.

I.      <u>Factual Background</u>

    A.    <u>Scrap Metal Fraud and Identity Theft</u>

      The defendant was born and raised in Staten Island, New York.  <u>See</u> Presentence Investigation Report ("PSR"), ¶ 86.  In approximately 2015, the defendant met an individual in the scrap metal and recycling business who is referred to in this case as "Co-Conspirator #1."  Padula and Co-Conspirator #1 met at the office of Staten Island attorney and co-defendant Richard Luthmann.  In the summer of 2015, Luthmann proposed that the three go into the scrap business together.  This proposal, however, was not to establish a legitimate scrap and recycling business; instead, the conspirators agreed that they would make contracts to sell scrap metal,

receive money from the customer, and then fail to make delivery of the product. PSR ¶¶ 11-13. In August 2015, Luthmann registered two companies with the New York Department of State—Commercial Metals NY ("Commercial") and Omni Metal Corporation ("Omni")—to carry out the fraudulent scheme. The choice of the names Commercial and Omni was purposeful; the company names closely matched legitimate scrap and recycling businesses. PSR ¶ 10. Indeed, at least one victim customer later told the government that the company believed it had contracted with the actual Omni company.

In late September 2015, Commercial contracted with Kanamax International ("Kanamax") to sell scrap metal. PSR ¶ 12. Kanamax wired $31,500 to Luthmann's attorney IOLA escrow account. Id. After Kanamax's money was deposited into Luthmann's account, the conspirators withdrew it and made no deliveries to Kanamax, stealing the $31,500. PSR ¶¶ 13-14. Kanamax then threatened Commercial with criminal charges and the conspirators decided to return the $31,500. PSR ¶ 14.

After that fraud, Luthmman, Co-Conspirator #1 and Padula undertook a new and significantly more deceitful scheme using their Omni corporation. PSR ¶ 15. The co-conspirators also began using aliases when interacting with customers; hired a figurehead president of the company; and began laundering the proceeds of the fraud through various banks. PSR ¶¶ 15-28. For his part, the defendant began to use the name "Arthur" when interacting with customers and workers. At some point, Luthmann came up with an idea to recruit a blind individual (the "Client") who was under the care of a guardian ad litem to be the nominal president of the scrap metal company. PSR ¶ 19. The Client was often panhandling outside of Luthmann's office.

To recruit the Client, the defendant went to meet the Client on the street near Luthmann's office. Using the name "Arthur," the defendant escorted the Client from the street up to Luthmann's law office. The Client met with Luthmann and told Luthmann about a legal case he wanted to bring. "Arthur" then told the Client that they had a job for him as president of a company. Luthmann then assured the Client the job would not jeopardize the Client's receipt of Social Security disability benefits. The Client accepted and thereafter had multiple meetings at Luthmann's office and met Co-Conspirator #1 (who was using an alias). Luthmann relayed to the co-conspirators that the Client could not be sued because he believed the Client was handicapped, and suggested that if they were ever sued, only the Client would be liable.

The defendant and his co-conspirators also had the Client open bank accounts for Omni in order to facilitate the fraud. PSR ¶¶ 21-23. Although several banks refused to open an account for Omni, Northfield Bank eventually opened one. PSR ¶ 22. Based on a referral from Luthmann, Israel Discount Bank ("IDB") also opened an account for Omni. PSR ¶ 23. The Client was taken by another co-conspirator to the various banks to conduct transactions during the scheme. Eventually, the co-conspirators used the Client's name and established an email account which they used to communicate with victim customers.

In the new fraudulent scheme, the defendant and his co-conspirators contracted to sell valuable scrap metal to buyers located abroad (usually in China) and then shipped them worthless filler materials. PSR ¶ 15. The Omni fraud operated from a warehouse in Staten

Island. PSR ¶ 16. At the warehouse, the defendant's co-conspirators would meet with potential buyers for scrap metal and show them product that was purportedly for sale and immediate shipment. The customers would then make a contract to buy the scrap metal, with delivery to be made abroad. Before the shipments were sent abroad, which would be done through shipping containers on freight boats, the conspirators would replace the scrap metal the buyer had seen and agreed to purchase with cheap, heavy filler material (such as concrete or road barriers).

The defendant worked frequently from the warehouse in Staten Island where the shipping containers were loaded with cement, filler material, and other garbage. PSR ¶ 17. There, he supervised two other individuals (described in the PSR as "Co-Conspirator #3" and "Co-Conspirator #4"), as well as various day laborers. The conspirators would cover the worthless filler material with just enough valuable scrap metal necessary to hide the garbage below it. To cover their tracks, they took photos and arranged the boxes being shipped so that it would appear as if the containers only were filled with valuable scrap metal. In particular, the defendant directed Co-Conspirator #3, Co-Conspirator #4, and others at the warehouse on how to properly fill the containers with garbage. Witnesses further advised that throughout the scheme, the defendant openly talked about his supposed organized crime connections in front of his co-conspirators. Additionally, the government learned from witnesses that Padula openly boasted about having access to firearms.

When Omni customers started receiving containers abroad and discovering filler materials inside the containers, they sought refunds from Omni. PSR ¶ 28. In response, the co-conspirators lied that the containers had been properly loaded, and blamed the victims for switching the containers. Id. Luthmann also sent letters from his law firm threatening legal action against the customers. Id.

Because the fraudulent scheme would be discovered once the shipping containers reached China, the conspirators worked quickly to make as many "sales" as possible before any shipments arrived. In just a few weeks, they were able to make over $484,000 in fraudulent sales. The customers' payments were transferred to the IDB account in the Client's name. The defendant, Luthmann, and Co-Conspirator #1 would meet at Luthmann's law office to divide proceeds and have meetings about their scrap metal fraud.

B.  Gunpoint Extortion of Co-Conspirator #1

In January 2016, while Co-Conspirator #1 was recovering from a surgery, the defendant visited Co-Conspirator #1 and informed him that Luthmann wanted certain legal fees paid. PSR ¶¶ 29-30. Co-Conspirator #1 gave the defendant money for Luthmann but was short approximately $7,000. PSR ¶ 30. The defendant subsequently agreed to loan the Co-Conspirator #1 the $7,000. Id.

The debt owed by Co-Conspirator #1 to Padula remained unpaid through December 2016. At that time, Padula enlisted the help of co-defendant Michael Beck to extort Co-Conspirator #1 into repaying Padula's money. The scheme drawn up by Padula, as described below, played out in a bizarre fashion.

3

First, in early December 2016, Padula hatched a plan to lure Co-Conspirator #1 so that he and Beck could threaten Co-Conspirator #1 with Padula's starter pistol. On December 5, 2016, Luthmann contacted Co-Conspirator #1 to ask him to meet at his law firm under the guise of having Co-Conspirator #1 sign some legal paperwork. PSR ¶ 32. When Co-Conspirator #1 arrived, Luthmann was not present. Id. Co-Conspirator #1 contacted Luthmann and asked about his whereabouts and Luthmann told Co-Conspirator #1 to wait inside a conference room in the office. Id.

While outside of the where Co-Conspirator #1 was waiting, Padula gave a starter pistol he owned to Beck to use to scare Co-Conspirator #1. Beck then entered the room where Co-Conspirator #1 was waiting and slapped Co-Conspirator #1 several times when he tried to leave the room. Beck then pulled out what appeared to be a handgun—the starter pistol that the defendant had provided to Beck earlier—and aimed the gun at Co-Conspirator #1's head and knee, directed him to sit on the couch in the room and threatened to shoot him. Beck told Co-Conspirator #1 that the money he had previously owed to the defendant (the $7,000 that the defendant loaned Co-Conspirator #1 in early 2016) was now owed to Beck. Id. Beck also told Co-Conspirator #1 that he added a $3,000 interest payment to the debt, and that Co-Conspirator #1 now owed him a total of $10,000. Id. Beck then handed the gun to the defendant, instructed the defendant to shoot Co-Conspirator #1 and left the room. After Beck left, the defendant took the bullets out of the gun in front of Co-Conspirator #1 and told him that Beck was serious. The defendant walked Co-Conspirator #1 out of the law office and told Co-Conspirator #1 not to call the police.

II.     Procedural History

On November 30, 2017, a grand jury in this District returned an eleven-count indictment against the defendant, Richard Luthmann, and Michael Beck. ECF Dkt. No. 1. The defendant was charged in nine of the eleven counts (Counts 1-4 and 7-11) of the original indictment, and the case was assigned to the Honorable Jack B. Weinstein, United States District Judge. On December 15, 2017, the defendant was arrested pursuant to the indictment. At the time of his arrest, federal law enforcement officers also searched the defendant's home, pursuant to a lawful search warrant, and recovered the starter pistol used to extort Co-Conspirator #1, unregistered firearms, and loose ammunition from within the defendant's home.

On May 31, 2018, pursuant to a plea agreement with the government, the defendant entered a plea of guilty to Count Nine of the indictment, charging extortionate collection of credit conspiracy, in violation of 18 U.S.C. § 894(a), and to a lesser-included offense of Count Eleven, carrying a firearm in connection with a crime of violence (to wit, Count Nine), in violation of 18 U.S.C. § 924(c)(1)(A)(i). The defendant subsequently withdrew from his plea allocution and agreement with the government, and Judge Weinstein returned this matter to its pre-trial posture.[1]  See ECF Dkt. Nos. 198, 205, 225, 226.

---

[1] A detailed explanation of the defendant's withdrawal of his guilty plea can be found in the government's January 16, 2020 motion requesting a competency evaluation for the defendant, which was filed under seal. See ECF Dkt. No. 230.

4

On October 29, 2019, the grand jury returned an eight-count Superseding Indictment against only the defendant (the co-defendants having pled guilty) charging fraud, kidnapping, identity theft, and firearms offenses.[2] ECF Dkt. No 221.  Counts One through Three of the Superseding Indictment charged the defendant with wire fraud conspiracy, aggravated identity theft, and money laundering conspiracy in connection with the scrap metal fraud scheme.  Counts Four through Eight of the indictment charged the defendant with kidnapping conspiracy, kidnapping, extortionate collection of credit conspiracy, threatening physical violence in furtherance of extortion, and using and brandishing a firearm in connection with a crime of violence.  These latter charges stem from the defendant's extortion of Co-Conspirator #1, which led to them briefly kidnaping Co-Conspirator 1 at gunpoint in Luthmann's law office.

In January 2020, following briefing and a hearing, Judge Weinstein found the defendant competent to assist in his defense and stand trial.  ECF Dkt. No. 234.  Thereafter, the case was reassigned to this Court.

On September 21, 2020, the defendant pleaded guilty before Your Honor to Count One of the Superseding Indictment, charging wire fraud conspiracy, in violation of 18 U.S.C. §§ 1343 and 1349, Count Two, charging aggravated identity theft, in violation of 18 U.S.C. § 1028A, and Count Seven, charging threatening physical violence in furtherance of the extortion of Co-Conspirator #1, in violation of 18 U.S.C. § 1951(a).  See ECF Dkt. No. 250.

On December 14, 2020, the U.S. Probation Office ("Probation") issued the PSR.  On January 26, 2021, the defendant submitted a 65-page letter objecting to various parts of the PSR.  See Def.'s Letter to the PSR, dated Jan. 26, 2021 ("Def.'s Objections").  On January 27, 2021, the government also filed a letter objecting to certain parts of the PSR.  The defendant also filed a sentencing submission on February 22, 2021.  See Dkt. 257 ("Def.'s Sentencing Letter").

III.   Guidelines Calculation

   A.   Applicable Law

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still required to consider Guidelines ranges in determining sentences, but also may tailor the sentence in light of other statutory concerns.  See 543 U.S. 220 (2005); see also 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).  Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

---

[2] Prior co-defendants Luthmann and Beck pleaded guilty, and Judge Weinstein sentenced Luthmann to 48 months' imprisonment in September 2019.  Beck is awaiting sentencing.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

B. The Application of the Guidelines

The plea agreement included a stipulated Guidelines estimate by the government and the defendant as to Counts One and Two, but not as to Count Seven. See Plea Agreement, at 4-6. As stated in the government's January 27, 2021 letter objecting to the PSR, Probation's Guidelines calculation in the PSR differs from the parties' plea agreement in one respect—namely, the Guidelines calculations for Count One (wire fraud conspiracy).

The PSR considered the defendant a manager or supervisor of the wire fraud conspiracy and therefore recommended a three-level enhancement for the defendant's role and an adjusted offense level of 24 for Count One. PSR ¶ 35. The government, however, submits that this role adjustment is not appropriate. While the defendant did direct certain activities at the Staten Island warehouse, his overall level of supervision of the entire fraudulent scheme was on par with Luthmann and Co-Conspirator #1. Ultimately, the defendant was not supervising or orchestrating the fraudulent scheme itself, but instead overseeing two low-level participants in certain constituent parts of the scheme (i.e., loading shipping containers and meeting customers). The defendant had no supervision role as to Luthmann and Co-Conspirator #1—the primary participants in the fraud—and thus a role adjustment would overstate the significance of his conduct. Thus, the government respectfully submits that the adjusted offense level for Count One is 21, as stipulated to in the parties' plea agreement. See Plea Agreement, at 4.

Except for the defendant's role adjustment for Count One, the government agrees that the PSR sets forth accurately the basis for the each of the offense level calculations and adjustments for Counts One, Two, and Seven. See PSR ¶¶ 34-37.

The government submits that the correct Guidelines calculation is thus:

Count One: Wire Fraud Conspiracy

| | |
|---|---|
| Base Offense Level (§§ 2B1.1(a)(1), 2X1.1(a)) | 7 |
| Plus: Loss Amount (§ 2B1.1(b)(1)(G)) | +12 |
| Plus: Sophisticated Means (§ 2B1.1(b)(10)) | +2 |
| Count One Total: | <u>21</u> |

6

<u>Count Seven: Threatening Physical Violence in Furtherance of a Plan to Extort</u>

| | |
|---|---:|
| Base Offense Level (§ 2B3.2(a)) | 18 |
| Plus: Express/Implied Threat of Death, Bodily Injury or Kidnapping (§ 2B3.2(b)(1)) | +2 |
| Plus: Use of Firearm (§ 2B3.2(b)(3)(A)(ii)) | +6 |
| Plus: Victim was Physically Restrained (§ 2B3.2(b)(5)(B)) | +2 |

Count Seven Total: <u>28</u>

| <u>Multiple Counts Analysis (§ 3D1.4)</u>: | <u>Level</u> | <u>Units</u> |
|---|---:|---:|
| Wire Fraud Conspiracy | 21 | 0.5 |
| Extortion Conspiracy | 28 | <u>1</u> |

Total Increase in Offense Level: +1

Offense Level Calculation

| | |
|---|---:|
| Highest Offense Level (§ 3D1.4) | 28 |
| Increase in Offense Level (§ 3D1.4) | <u>+1</u> |

**Total Offense Level** **<u>29</u>**

      The defendant should receive a two-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a), and the government hereby moves for an additional one-level reduction for early acceptance under § 3E1.1(b). This results in a Final Offense Level of 26. The defendant is in Criminal History Category I. The advisory Guidelines ranges is 63 to 78 months' imprisonment. Because Count Two contains a mandatory minimum consecutive sentence of 24 months, the total effective Guidelines range is therefore 87-102 months in prison. Pursuant to the parties' plea agreement, the government seeks only a sentence of 87 months' imprisonment. <u>See</u> Plea Agreement, at 7.

      C.      <u>Defendant's Factual Objections to the PSR Regarding the Charged Conduct</u>

      On January 26, 2021, the defendant submitted a 65-page objection letter to the PSR. In the letter, the defendant raises objections to the PSR's Guidelines estimate calculations as well as a number of factual objections to the PSR that have no bearing on the Guidelines calculation but, instead, appear intended to minimize the defendant's role in the scrap metal fraud and extortion.

1.   Defendant's Challenges to the PSR's Guidelines Calculations

   a.   Count One (Wire Fraud Conspiracy)

Similar to the government, the defendant objects to the PSR's recommendation of the three-level enhancement for his role in the wire fraud conspiracy. See Def.'s Objections, at 5-10, Paragraph 35. The defendant argues that, contrary to the PSR, he did not give instructions to his co-conspirators as to how to carry out the scrap metal fraud and that he did not oversee his co-conspirators' loading of the shipping containers, but that even if he did, such conduct did not make him a manager or supervisor of the fraud. Thus, the defendant requests that paragraph 35 of the PSR be amended to reflect that he was neither a manager or supervisor in the offense and eliminate any role enhancement.

The government maintains that the defendant directed his co-conspirators' activities at the warehouse in Staten Island and that such information should remain in the PSR. However, as set forth above, the government agrees that the three-level enhancement for Count One is not appropriate in this case.

   b.   Count Seven (Threatening Physical Violence In Furtherance Of A Plan To Extort)

The defendant also objects to each of the enhancements—specifically, the two-level enhancement for threat of death or bodily injury, the two-level enhancement for physically restraining the victim, and the six-point enhancement for use of a firearm—applied in Count Seven. See Def.'s Objections, at 10-13, Paragraph 37. The government responds to each of these objections in turn.

First, the defendant objects to the two-point increase for threat of death or bodily injury to the victim as "impermissible double counting" for Count Seven. According to the defendant, the base offense level for Count Seven already accounts for the defendant's threatening of physical violence to a victim by means of a pistol. See Def.'s Objections, at 10-11. However, impermissible double counting "does not result from the increases for both actual bodily harm and threatened bodily injury over the base offense of extortion." Riza v. United States, 933 F. Supp. 331, 336 (S.D.N.Y. 1996). "Double counting is permissible in calculating a Guidelines sentence where, as here, each of the multiple Guidelines sections applicable to a single act serves a distinct purpose or represents a discrete harm." United States v. Maloney, 406 F.3d 149, 152 (2d Cir. 2005); see also United States v. Volpe, 224 F.3d 72, 76 (2d Cir. 2000) ("[M]ultiple adjustments may properly be imposed when they aim at different harms emanating from the same conduct."). In this case, the threats, firearm, and physical restraint enhancements are proper because "[n]either actual bodily harm nor threatened bodily injury is a necessary element for extortion. Rather, the crime of extortion involves a wide range of conduct, including extortion through the use of economic threats or injury." Riza, 933 F. Supp. at 336. See also United States v. Ruggiero, 100 F.3d 284, 293 (2d Cir. 1996) (rejecting appellant's argument that the imposition of multiple enhancements under the extortion guideline for implied threats, use of a weapon, and abduction constituted impermissible double counting as "without merit"). Thus, any argument regarding impermissible double counting should be rejected.

8

In the alternative, the defendant argues that even if it was permissible for the Court to apply the threats enhancement, the enhancement should not apply to him, because he walked into the room after Beck had already threatened Co-Conspirator #1 with the gun and that he (the defendant) was the one who took the bullets out of the gun. See Def.'s Objections, at 10-11. But irrespective of when the defendant entered the room (either with or after Beck), the defendant does not contest the crucial facts of the extortion: that he planned and participated in luring Co-Conspirator #1 to Luthmann's law office so that the defendant and Beck could threaten Co-Conspirator #1 with a firearm; that he provided the firearm to be used to Beck; that after Co-Conspirator #1 was lured to Luthmann's law office, the defendant was present in the room when Co-Conspirator #1 was told that he owed $10,000 to Beck; that Beck told the defendant to shoot Co-Conspirator #1; that the defendant took the gun from Beck; and that the defendant told Co-Conspirator #1 that Beck was serious and not to call the police. For these reasons, the government respectfully submits that the two-point enhancement for threatening death and bodily injury to the victim should be applied.

Second, the defendant raises various arguments as to why the two-point enhancement for physical restraint should not apply. See Def.'s Objections, at 10-11. The defendant argues that simply blocking another or displaying a gun does not constitute physical restraint under the relevant Sentencing Guidelines. He further argues that Beck was the one who physically blocked Co-Conspirator's exit and that he (the defendant) de-escalated the situation by unloading the starter pistol and walking him out of the premises. He also argues that any physical restraint of the victim was already accounted for in the six-point enhancement for using the starter pistol to extort. And finally, he argues that because the government did not assert the physical restraint enhancement at Luthmann's sentencing, it would be inappropriate for the government to apply it to the defendant.

The government respectfully submits that the physical restraint enhancement should apply. The defendant and Beck did more than just display a gun at the victim and herd the victim into a closed room. See United States v. Taylor, 961 F.3d 68, 78-79 (2d Cir. 2020) (explaining that the physical restraint enhancement turns on "(1) whether the restraint was physical, (2) whether there was restraint rather than just use of force, and (3) whether the action in question was constitutive of the [crime] or whether it was an additional physical restraint that facilitated the [crime]."). Here, the defendant lured Co-Conspirator #1 to Luthmann's empty law office at night. There, Co-Conspirator #1 waited in a closed office when co-defendant Beck came in with the firearm provided by the defendant. Inside the room, Beck slapped Co-Conspirator #1 several times when he tried to leave and while brandishing the firearm, forced him to remain in the room by threatening to shoot him in the head and knee. The defendant also was present in the office while Beck was holding Co-Conspirator #1 at gunpoint with a firearm to both his head and knee. This, among other things, formed the basis for the kidnaping charge in this matter. Thus, it is beyond question that the defendant and Beck held Co-Conspirator #1 in this room and prevented his leaving.

Moreover, the "application of the enhancement for physical restraint is proper as long as restraint is not an element of the primary offense for which the defendant is being sentenced, and it therefore does not result in double counting offense conduct toward sentencing." United States v. Rosario, 7 F.3d 319, 321 (2d Cir. 1993). Not all offenses under § 1951(a) need to involve a holding a victim in the room at gunpoint, as this offense did. There

9

is no risk of double-counting in the inclusion of this enhancement, as it captures that the extortionate conduct here was significantly beyond threats. Additionally, the defendant's argument that he de-escalated the situation is fanciful, as he is the individual who concocted the plan to get the debt owed to him repaid and who provided Beck the firearm. Finally, in response to the defendant's argument that the government did not assert the physical restraint enhancement at Luthmann's sentencing, the government submits that the enhancement is appropriate in this case because it was Padula, not Luthmann, who was in the room with Co-Conspirator #1 and who most directly facilitated Beck's restraint of Co-Conspirator #1.

       Third, the defendant argues that the six-point enhancement for use of a firearm under U.S.S.G. § 2B3.2(b)(3)(A)(ii) is inapplicable. See Def.'s Objections, at 2-3, Paragraph 32. U.S.S.G. § 3B3.2 provides a six-point enhancement if a "firearm was otherwise used" during the extortion, and cross-references U.S.S.G. § 1B1.1, which defines a "firearm" to mean "(i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." See also 18 U.S.C. § 921(a)(3) (same definition of "firearm"). U.S.S.G. § 1B1.1 also explains that "'[o]therwise used' with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon."

       The central issue here is whether the starter pistol Padula and Beck used—an ATAK Arms, Stalker M206, 9mm PAK caliber blank starter pistol—constitutes a "firearm" under U.S.S.G. § 1B1.1 and 18 U.S.C. § 921(a)(3). Although the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") previously tested the same type of starter pistol used in this case and concluded that it is a firearm readily convertible to fire an explosive, the defendant challenges the ATF's findings on the basis that the ATF did not test the "particular model of the blank pistol in this case" and instead, tested and converted a UK model of the starter pistol. See Def.'s Objections, at 3. The defendant also hired his own firearms expert to test a 9mm PAK Caliber ATAK Arms Co., Ltd. Stalker blank gun, who determined that it took 50 minutes to convert the model gun and four attempts to fire the starter pistol. According to the defense expert, the pistol also exploded upon firing. The defendant now argues that based on his expert's findings, the starter pistol at issue does not qualify as a "firearm" under 18 U.S.C. § 921(a)(3).

       In response to the defendant's objections, and to foreclose any further argument regarding this issue, the government asked the ATF to test the actual starter pistol Beck and Padula used to extort Co-Conspirator #1, which was seized from the defendant on or about December 15, 2017. The ATF has completed its testing and on or about March 25, 2021, the agency issued a supplemental report documenting its testing and conversion of the starter pistol. See Exhibit A, ATF Report, dated Mar. 25, 2021.[3] In short, as demonstrated by the supplemental report, the ATF was able to readily convert the starter pistol Padula and Beck into a firearm and test-fire the pistol in less than 10 minutes. The starter pistol also remained intact even after conversion and the test-fire. Thus, there can be no question that the starter pistol constitutes a

---

[3] The testing and conversion process was recorded by the ATF, and a copy of the video is enclosed hereto for the Court. See Exhibit B. A copy of the supplemental ATF report and video recording is being concurrently produced to defense counsel.

"firearm" under 18 U.S.C. §921(a)(3). The defendant's objection to the enhancement on this basis should therefore be rejected.

In a last-ditch effort, the defendant argues that the firearms enhancement should not apply because the starter pistol was not "otherwise used" because it was never more than brandished. See Def. Objections, at 13. This objection is wholly meritless. The defendant does not contest that he gave the gun to Beck prior to entering the conference room with Co-Conspirator #1 or that the gun was used to intimidate and threaten Co-Conspirator. Indeed, the defendant was present when Beck used the gun to prevent Co-Conspirator #1 from leaving the conference room, and then pointed it at Co-Conspirator #1's head and knees. The defendant also took the gun from Beck after Beck handed the gun to him and told him to Co-Conspirator #1. Thus, this objection should also be rejected.

2. Other Factual Challenges to the PSR Regarding the Charged Offenses

The defendant also lodged a number of factual objections to the PSR that have no bearing on the Guidelines calculation but, instead, appear intended to minimize the defendant's role in the wire fraud conspiracy, aggravated identity theft and the extortion of Co-Conspirator #1. The government's response to each objection is as follows:

- Pages 1-2; Paragraphs 8 and 18 of the PSR—The defendant objects to the fact he made representations to his co-conspirators, including Co-Conspirator #1, that he had family members connected to organized crime, and that he threatened to call on his organized crime connections if the co-conspirators did not comply with his instructions and demands. The government's evidence that the defendant openly claimed that he had ties to organized crime is based on witness statements. This objection should be rejected.

- Page 2; Paragraphs 17 and 18 of the PSR—The defendant objects to the statement that he and his co-conspirators recruited Co-Conspirator #3 and Co-Conspirator #4 to assist them in loading shipping containers with cement and other filler material, and that he instructed them on how to carry out the fraud, including how to load the shipping containers. The government agrees with this objection in part. The government clarifies that Luthmann was the one who recruited both Co-Conspirator #3, who in turn, recruited Co-Conspirator #4. However, the government maintains that the defendant instructed his co-conspirators on how to fill the containers. This is based on witness statements, numerous of which related that the defendant was frequently at the Staten Island warehouse with Co-Conspirator #1 overseeing his co-conspirators who were loading the shipping containers.

- Page 2, Paragraph 28 of the PSR—The defendant objects to the statement that some of Omni's customers contacted the defendant to seek refunds after discovering that the shipping containers contained worthless filler material. The government's evidence is based on email communications between the victims and "Arthur" (the alias that the defendant used) regarding the scrap metal fraud. Thus, the objection should be rejected.

- Page 2, Paragraph 31 of the PSR—The defendant denies making certain statements to Co-Conspirator #1, including that Beck is an enforcer for the defendant, and that

11

each of them had to pay $20,000 in order to receive Beck's protection against members of Chinese organized crime. The defendant also denies that Co-Conspirator #1 paid him $20,000 at his direction. The government's evidence is based on a witness statement. The statement would include details and the fact that Co-Conspirator #1 paid money for this supposed event having occurred. This objection should be rejected.

- Pages 2 to 5, Paragraph 32 of the PSR—The defendant objects to PSR's reference to the starter pistol the defendant gave Beck to extort Co-Conspirator #1 in December 2016 as a "firearm." As discussed supra, the starter pistol at issue in this case qualifies as a "firearm" under U.S.S.G. §1B1.1 and 18 U.S.C. § 921(a)(3); thus, this objection should be rejected. The defendant also objects to the statement in the PSR that "Padula and Beck entered the room" because he purportedly entered the room after Beck had already brandished the starter pistol and stated that Co-Conspirator #1 owed him (Beck) money. As discussed above, this objection should also be rejected.

- Page 5, Paragraph 34 of the PSR—The defendant objects to the statement that he was involved in, among other crimes, money laundering and kidnapping. According to the defendant, he did not plead to those offenses and there is insufficient evidence regarding his involvement in those crimes. This objection is without merit. In addition to the charges the defendant pleaded guilty, he was indicted on charges of money laundering conspiracy, kidnapping, and extortionate collection of credit conspiracy. Thus, the statement in the PSR is factually accurate and the defendant's objection should be rejected.

- Pages 5 to 10, Paragraph 35 of the PSR—The defendant objects to the role enhancement being included in Count One's calculation. As detailed above, the government agrees and this objection should be sustained.

- Pages 10 to 13, Paragraph 37 of the PSR—The defendant objects to the enhancements being included in Count Seven's Guidelines calculation. As detailed above, the government disagrees and requests that the Court apply the extortion-related enhancements in determining the defendant's sentence.

- Pages 13 to 14, Paragraphs 39 and 41 of the PSR—The defendant objects to the statement that Co-Conspirator #3 and Co-Conspirator #4 worked "at the direction of Luthmann and Padula" because he did not direct any co-conspirators. Again, the government's evidence is based on witness statements regarding the defendant's role in the scrap metal fraud, and thus, the objection should be rejected.

IV.   The Appropriate Sentence

As stated above, the effective advisory Guidelines range for the defendant is 87 to 102 months in prison (when the consecutive 24-month mandatory minimum is included). Pursuant to the parties' plea agreement, however, the government agreed not to seek a sentence greater than 87 months. Thus, the government respectfully requests that the Court impose a sentence of 87 months' imprisonment. Such a sentence is appropriate to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18

U.S.C. § 3553(a)(2)(A).  The requested sentence will also further the aims of specific and general deterrence.  See id. §§ 3553(a)(2)(B), (a)(2)(C).

### A.  The Nature and Circumstances of the Offense

The government respectfully submits that the nature and circumstances of the defendant's offense weigh in favor of a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).  The defendant aligned himself with Luthmann, an unscrupulous fraudster, to make easy money, and plotted with him and others to carry out fraudulent scams and extortions.  Although Luthmann was an attorney and clearly an architect of the scheme, the defendant was by no means a passive participant.  The defendant worked closely with Co-Conspirator #1, clearly embracing cheating innocent customers to enrich himself.  The defendant bragged about his connections to organized crime and then used these self-professed ties to intimidate and threaten others into complying with his directives.  He and his co-conspirators also egregiously recruited a blind person under the care of a guardian ad litem to be the nominal president of the company.  Here, the defendant played a principal role, all for the purpose of trying to set up a fall-guy for the fraud that would keep scrutiny from the defendant, Luthmann, and Co-Conspirator #1.

Consistent with boasting about having connections to organized crime, the defendant also hatched a plan to get a debt owed to him repaid through violence.  He set up the scheme to have the $7,000 he had loaned Co-Conspirator #1 repaid through physical violence.  He enlisted Beck (who was not owed any money) into his scheme, provided him the firearm, and made arrangement to use Luthmann's office to carry out this extortion.  The defendant thus demonstrated he could mastermind and carry out the type of criminal scheme he had long claimed to others he was capable of.

### B.  The History and Characteristics of this Defendant and Specific Deterrence

The history and characteristics of the defendant also call for a Guidelines sentence.  As the Court is aware, the government previously brought numerous troubling statements made by the defendant to Judge Weinstein's attention.  Certain of these baseless allegations have resurfaced in defendant's sentencing memorandum (Def. Memo at 2, 14, 15).  The consistent theme of these statements, whether they were directed at the government, Bureau of Prisons personnel, law enforcement agents, and even uninvolved third parties is that everyone but the defendant is responsible for his commission of these offenses, arrest, and conviction.  Even after his guilty plea in this matter, the defendant has continued in his scurrilous accusations that the charges against him are part of a broad conspiracy to frame him.

At bottom, the claims the defendant continues to make are lies.  They are lies much like the statements he, Luthmann, Co-Conspirator #1 and others told the customers to whom they "sold" scrap metal.  They are lies that ultimately hurt victims and cost them real money and heartache.  The defendant's actions to date have not demonstrated a full appreciation of the consequences of his behavior, and his arrest and pre-trial detention have appeared to have done little to dissuade him from changing the hostile, often threatening manner in which he approaches the world.  The defendant has not demonstrated remorse for his conduct.  As such, there is a clear need for specific deterrence in sentencing.

C. The Need for General Deterrence and to Promote Respect for the Law

The need for general deterrence and respect for the law are also significant factors that weigh in favor of a Guidelines sentence. On the fraud-related conduct, as financial crimes are difficult to detect and prosecute, there is greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)).

On the extortion, there is also a clear need for the sentence to serve as a beacon that extortionate conduct, whether with a real semi-automatic weapon, or a starter pistol that resembles one, warrants a meaningful prison sentence. When the victim of the extortion was held at gunpoint, he had no way of knowing whether Padula's weapon could fire at any moment—the threat the defendant was sending inside Luthmann's law office was clear. The defendant's sentence should therefore send a clear message to others that use of firearms or other threats of violence to intimidate and extort will not be tolerated by the law.

D. The Need to Provide Just Punishment

The government respectfully submits that the need for just punishment in this case supports a sentence of 87 months' imprisonment. See 18 U.S.C. § 3553(a)(2)(A). The crimes the defendant committed are serious and brazen and involve a number of victims, and were all perpetrated for the sake of making easy money. Given the defendant's lack of remorse and continuous attempt to deflect and minimize his conduct, such a sentence is warranted to reflect the seriousness of the defendant's offenses.

E. A Sentence of 87 Months' Imprisonment Would Not Result in an Unwarranted Sentencing Disparity

Co-defendant Luthmann received a sentence of 48 months' imprisonment. Several factors distinguish Padula from his co-defendant, and they principally relate to violence. It was through the defendant that violence entered into this case. The government has never claimed that the defendant masterminded the fraud case. Instead, the defendant served as the enforcer for this group—the principal aggravating factor of the scheme. He openly boasted about his ties to organized crime, concocted a plan to extort Co-Conspirator #1 to get his money repaid, recruited Beck into the extortion scheme, and brought the firearm used by Beck to extort Co-Conspirator #1. While Luthmann also participated in the extortion of Co-Conspirator #1 by setting up the scene and luring Co-Conspirator #1 to his law firm office, it was the defendant who brought violence and a firearm into play. For these reasons, a sentence of 87 months' imprisonment would not result in any unwarranted sentencing disparity in this case.

V.       Conclusion

        For the foregoing reasons, the government respectfully submits that a sentence of 87 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

                                        Respectfully submitted,

                                        MARK J. LESKO
                                        Acting United States Attorney

                      By:           /s/
                                        James P. McDonald
                                        Genny Ngai
                                        Assistant U.S. Attorneys
                                        (718) 254-7000

cc:      Clerk of Court (RJD) (by ECF)
          Chad Seigel, Esq. (by Email)
          Jennifer Fisher, U.S. Probation Department (by Email)